780 F.2d 1389
 54 USLW 2369, 12 Media L. Rep. 1913
 The UPPER MIDWEST BOOKSELLERS ASSOCIATION, a Minnesota
corporation, and Harvey Hertz, d/b/a A Brother's
Touch Bookstore, Appellants,
v.
CITY OF MINNEAPOLIS, a municipal corporation, Appellee.
 No. 85-5077.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 11, 1985.
Decided Dec. 31, 1985.
Rehearing and Rehearing En Banc Denied Feb. 14, 1986.
As Amended March 11, 1986.
 
 Randell D.B. Tigue, Minneapolis, Minn., for appellants.
 Michael A. Bamberger, New York City, for amicus, the American Booksellers.
 David M. Gross, Minneapolis, Minn., for appellee.
 Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This case presents the question of the constitutionality of a portion of an ordinance enacted by the City of Minneapolis (City) that attempts to regulate the manner in which certain sexually explicit material deemed "harmful to minors" is displayed for sale. Upper Midwest Booksellers Association, a trade organization of retail merchants, and Harvey Hertz, an individual bookseller, filed suit against the City seeking to have a portion of the ordinance declared unconstitutional and to enjoin its enforcement. (We hereinafter refer to the plaintiffs-appellants collectively as Midwest.) The District Court[1] issued a temporary restraining order directing the City not to enforce the ordinance pending a final hearing. After the final hearing, the Minneapolis City Council amended the ordinance to meet some of Midwest's objections. The District Court, 602 F.Supp. 1361, then held that the ordinance satisfied constitutional standards with the exception of one provision of the ordinance granting exemptions from coverage to several groups. The Court severed the offending provision and upheld the remainder of the ordinance. Midwest appeals from the judgment below asserting that the District Court erroneously determined that the challenged display provision of the ordinance was permissible under the First Amendment as applied to the States through the Fourteenth Amendment and that the District Court erred in deciding that the invalid portion of the ordinance properly could be severed from the remainder of the ordinance. We affirm.
 
 I.
 
 2
 On July 13, 1984, the Minneapolis City Council enacted section 385.131 of the Minneapolis City Ordinances.[2] Subsection 6 of the ordinance makes it unlawful for any person knowingly to display for commercial purposes any material that is "harmful to minors" unless that material is in a sealed wrapper. The ordinance further requires an opaque cover on any material whose "cover, covers, or packaging, standing alone, is harmful to minors." Minneapolis City Ord. Sec. 385.131(6)(a).[3] The District Court held that the display regulations contained in subsection 6 are constitutionally permissible.
 
 
 3
 Subsection 6 of the ordinance is an adoption of one of the recommendations of the Final Report of the City of Minneapolis Task Force on Pornography, see Joint Appendix at 30, and is limited strictly to those materials that the ordinance defines as "harmful to minors." Subsection 3(e) of the ordinance defines "harmful to minors" as follows:
 
 
 4
 "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, or sexual excitement, when it:
 
 
 5
 (1) predominantly appeals to the prurient, shameful, or morbid interest of minors in sex; and(2) is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable sexual material for minors; and
 
 
 6
 (3) taken as a whole, lacks serious literary, artistic, political or scientific value.[4]
 
 
 7
 Minneapolis City Ord. Sec. 385.131(3)(e).
 
 
 8
 Subsections 6(b) and 7 of the ordinance provide two exemptions to the above requirements. First, the provisions of the ordinance requiring sealed wrappers and opaque covers do not apply if minors are not allowed to be present or are not able to view the proscribed materials or their covers. Id. Sec. 385.131(6)(b). A business is considered in compliance with this exception if it physically segregates the proscribed material so that minors cannot be present or cannot view the materials, posts a sign reading "Adults Only--you must be 18 to enter," and enforces these restrictions. Id. Second, subsection 7(a) exempts schools, religious institutions, and certain other entities and individuals from liability under the ordinance. Id. Sec. 385.131(7)(a). The District Court held that subsection 7(a) violated the equal protection clause of the Fourteenth Amendment and severed that provision from the remainder of the ordinance. The City has not appealed the District Court's decision that subsection 7(a) violates the equal protection clause.
 
 II.
 
 9
 Midwest relies on the First Amendment overbreadth doctrine to challenge the facial validity of subsection 6 of the Minneapolis ordinance.[5] Subsection 6 of the ordinance is the sole portion of the ordinance challenged in this appeal. Midwest first contends that the City exceeded the scope of its governmental authority to regulate the dissemination of sexually explicit material by requiring an opaque cover on any item whose cover standing alone is harmful to minors. Midwest argues that this provision is constitutionally overbroad because whether material is subject to regulation must be assessed on the basis of the work taken as a whole. Midwest further asserts that the cover and wrapper requirements of the ordinance are overbroad because they impermissibly limit the access of adults to materials that are constitutionally protected as to them.
 
 
 10
 The Supreme Court has noted that the overbreadth doctrine is "strong medicine" that should be employed only "with hesitation, and then 'only as a last resort.' " New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) ). The Court further observed that, at least when conduct plus speech is involved, the overbreadth must be "real" and "substantial" in relation to an ordinance's "plainly legitimate sweep" before the ordinance should be invalidated on its face. 458 U.S. at 770, 102 S.Ct. at 3361. The Minneapolis ordinance relates to both conduct and speech because it regulates the manner in which certain speech may be disseminated. The ordinance, therefore, must be substantially overbroad before we will invalidate it on its face.
 
 A.
 
 11
 It is a settled proposition that a state is entitled under its police power to regulate obscene material. See Miller v. California, 413 U.S. 15, 22, 93 S.Ct. 2607, 2613, 37 L.Ed.2d 419 (1973); Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957). The Supreme Court, however, has found it somewhat more difficult to agree upon a standard to assess whether particular material is obscene and thus not entitled to constitutional protection. In Miller, the Court provided the current definition of obscenity. The Court held that to regulate materials as obscene, the regulation must "be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615.
 
 
 12
 The Court, in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), upheld a New York statute, similar to the Minneapolis ordinance, prohibiting the sale of certain sexually explicit material to minors under the age of 17 when the material was within the statutory definition of "harmful to minors." The New York statute's definition of "harmful to minors" was an adaptation of the pre-Miller obscenity standard to require an assessment of whether the material was suitable for minors under prevailing community standards. Justice Brennan, writing for the majority, held that it was constitutionally permissible for New York "to accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see." Ginsberg, 390 U.S. at 637, 88 S.Ct. at 1279. The Court, quoting Chief Judge Fuld of the New York Court of Appeals in People v. Kahan, 15 N.Y.2d 311, 312, 258 N.Y.S.2d 391, 392, 206 N.E.2d 333, 334-35 (1965), observed:
 
 
 13
 While the supervision of children's reading may best be left to their parents, the knowledge that parental control or guidance cannot always be provided and society's transcendent interest in protecting the welfare of children justify reasonable regulation of the sale of material to them. It is, therefore, altogether fitting and proper for a state to include in a statute designed to regulate the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such material to adults.
 
 
 14
 390 U.S. at 640, 88 S.Ct. at 1281. Justice Stewart explained the Court's rationale behind allowing greater state regulation to protect children from material otherwise privileged under the First Amendment: "[A] child--like someone in a captive audience--is not possessed of that full capacity of individual choice which is the presupposition of First Amendment guarantees." Id. at 649-50, 88 S.Ct. at 1286 (Stewart, J., concurring).
 
 
 15
 Midwest does not contend that the Minneapolis ordinance is overbroad because of its definition of materials that are subject to regulation, i.e., that are harmful to minors. The ordinance's definition of those materials is substantially the same as the definition approved in Ginsberg except as modified to comport with the Court's more recent obscenity standard enunciated in Miller. See supra note 4. Instead, Midwest asserts that because subsection 6(a) of the ordinance requires material whose cover alone is harmful to minors to be concealed by an opaque cover, the ordinance exceeds the bounds of appropriate regulation by not assessing the material "as a whole." In support of this position, Midwest cites Kois v. Wisconsin, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), and Erznoznik v. City of Jacksonville, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).
 
 
 16
 In Kois, the publisher of an "underground" newspaper was convicted of disseminating obscene material in violation of state law. The basis of his conviction was the publication of a photograph accompanying an article in the newspaper and the publication of a poem among a group of poems. The article recounted the arrest of one of the newspaper's photographers on a charge of possession of obscene material and included a picture described as similar to those seized from the photographer. The poem was entitled "Sex Poem" and was a graphic description of the author's recollection of sexual intercourse. In reversing the publisher's conviction, the Supreme Court indicated that the material must be "taken as a whole" in determining whether " 'the dominant theme of the material ... appeal[s] to the prurient interest' " and thus may be considered obscene. 408 U.S. at 230, 92 S.Ct. at 2246 (quoting Roth, 354 U.S. at 489, 77 S.Ct. at 1311).
 
 
 17
 Our reading of Kois leads us to conclude that the "taken as a whole" requirement has no application outside the context of an attempt totally to suppress obscene material or criminally to prosecute someone for the dissemination of that material.[6] As the legal context changes, the line between permissible and impermissible standards of regulation on the part of the State shifts as well. The Court in Kois observed that "[a] reviewing court must, of necessity, look at the context of the material, as well as its content." 408 U.S. at 231, 92 S.Ct. at 2247. We note that the photo in Kois was placed in the midst of the text and related to and illustrated the point of the article. In the instant case, we discern no harm to First Amendment values that could result from the requirement that sexually explicit covers of books and magazines be shielded from view by an opaque cover. We agree with the District Court that "to a child who may never acquire and read or view the entire work, the cover of the book or magazine is the 'work as a whole.' " 602 F.Supp. at 1369. The "context" of this material is that it is necessarily physically separated from any material inside the work that could give it "serious value" and thus bears little relation to any point, if indeed there be any, made by the supporting text. Moreover, and perhaps more importantly, the opaque cover portion of the ordinance in no way suppresses the dissemination of the material and thus only mandates the manner of display of the material. We therefore find the "as a whole" requirement as set forth in Kois simply inapplicable.
 
 
 18
 Likewise, Erznoznik does not mandate the result Midwest contends is required. In Erznoznik, the Court addressed a challenge to the facial validity of a city ordinance that proscribed the exhibition by a drive-in movie theater of any film containing nudity if its screen was visible from a public street or place. The Court observed that the ordinance was neither "directed against sexually explicit nudity, nor ... otherwise limited" and noted that all nudity could not be considered obscene even as to minors. 422 U.S. at 213, 95 S.Ct. at 2274. The Court then held that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." Id. at 213-14, 95 S.Ct. at 2275 (citations omitted; emphasis added).
 
 
 19
 The ordinance in the instant case differs from the ordinance in Erznoznik in two respects. First, the Minneapolis ordinance is limited to only those materials that are obscene as to minors. Second, the ordinance does not seek to suppress those materials. Rather, the opaque cover requirement restricts only the manner in which they may be displayed. Midwest asserts that Erznoznik forecloses any argument that magazine and book covers may be viewed in isolation. Midwest directs attention to the Supreme Court's rejection of a "similar" argument in Erznoznik, i.e., that a nude scene constitutes the "whole work" to passersby of a drive-in movie theater. We think this argument fails because the ordinance in Erznoznik was impermissible both because it banned mere nudity which was not obscene as to adults or minors and because the enforcement of the ordinance would have resulted in the total suppression of the material in question. The Court in Erznoznik stated only that the material could not be suppressed. Id. The Minneapolis ordinance merely regulates the manner of display of materials harmful to minors. It does not forbid the display of such materials and does not limit their sale to adults. The materials thus are not "suppressed" within the meaning of Erznoznik.[7]
 
 
 20
 We conclude that the "as a whole" requirement does not prevent the City from regulating the manner of display of materials that are harmful to minors because that requirement was adopted in an entirely different setting, namely, in determining whether the materials could be suppressed.[8] Since the cover provision of the ordinance is intended to protect the welfare of children by governing the manner of display, we now proceed to determine whether the ordinance is a permissible time, place, or manner restriction.
 
 B.
 
 21
 Reasonable time, place, or manner restrictions of speech protected under the First Amendment are permissible to further significant governmental interests. Young v. American Mini Theatres, 427 U.S. 50, 63 n. 18, 96 S.Ct. 2440, 2449 n. 18, 49 L.Ed.2d 310 (1976). The Supreme Court repeatedly has recognized "that the government's interest in the 'well-being of its youth' and in supporting 'parents' claim to authority in their own household' justifie[s] the regulation of otherwise protected expression." FCC v. Pacifica Foundation, 438 U.S. 726, 749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (quoting Ginsberg, 390 U.S. at 640, 639, 88 S.Ct. at 1281, 1280); see New York v. Ferber, 458 U.S. 747, 757, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 57, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973). As we observed above, obscene material generally is not entitled to any constitutional protection and thus may be regulated by the state. The problem in this case arises because the Minneapolis ordinance regulates the display, rather than only the sale to minors, of material that is obscene as to minors but which is not obscene as to adults. The ordinance therefore limits to some extent the ability of adults to visit a bookstore or newsstand and browse through material that is obscene as to children but not as to adults. Because the regulation here simultaneously affects material protected in relation to one group--adults--and unprotected in relation to another group--minors--it falls into the interstices of current First Amendment doctrine. The question we must address is whether the City has struck an appropriate balance between its legitimate interest in the protection of its young and allowing adults access to material protected under the First Amendment.
 
 
 22
 The Minneapolis ordinance is basically the same as the statute upheld in Ginsberg except that the ordinance here not only prohibits the dissemination to minors of material obscene as to them but also restricts the manner of display of that material. The sealed wrapper requirement prevents either adults or minors from scanning the material prior to purchase.[9] Thus, the restrictions contained in the ordinance do have an incidental effect on the First Amendment rights of adults. Midwest argues that this incidental effect renders the ordinance invalid under Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957). In Butler, the Supreme Court unanimously condemned a statute absolutely prohibiting adults or minors from disseminating or possessing any material "tending to the corruption of the morals of youth." Id. at 381, 77 S.Ct. at 525. The Court stated that the legislation was "not reasonably restricted to the evil with which it is said to deal" and noted that the result of the statute was "to reduce the adult population ... to reading only what is fit for children." Id. at 383, 77 S.Ct. at 526.
 
 
 23
 Although it is true that the sealed wrapper provision limits adults as well as children from engaging in pre-purchase examination of material regulated by the ordinance, we do not find the ordinance to be incompatible with Butler. The statute in Butler resulted in the total suppression of the material covered by the statute. Here, as the District Court observed, the ordinance "does not prohibit adults from purchasing non-obscene materials; adults continue to have ultimate access to the materials in question." 602 F. Supp. at 1370. We note that the Supreme Court has rejected suggestions similar to that now advanced by Midwest regarding the applicability of Butler to restrictions that are intended to protect minors but that also affect adults, and we decline to extend Butler to prohibit reasonably structured display regulations. See Ginsberg, 390 U.S. at 634-35, 88 S.Ct. at 1277-78 (Butler inapplicable because retailers not prohibited from stocking and selling magazines covered under statute); Pacifica Foundation, 438 U.S. at 750 n. 28, 98 S.Ct. at 3040 n. 28 (adults still may purchase material despite restrictions).
 
 
 24
 We believe that the ordinance in the instant case is one that is "carefully limited," Miller, 413 U.S. at 24, 93 S.Ct. at 2614, and that does not unduly burden the First Amendment rights of adults. See Butler, 352 U.S. at 383, 77 S.Ct. at 525; cf. Erznoznik, 422 U.S. at 213, 95 S.Ct. at 2274. Any burden here is the result of the permissible regulation of material that is obscene as to minors. The restriction in relation to adults is merely an incidental effect of the permissible regulation and is minimal in its impact. Adults are still free to request a copy of restricted material to view from a merchant or to peruse the material in adults only bookstores or in segregated sections of ordinary retail establishments. More significantly, adults are still able to view any of the material in a free and unfettered fashion by purchasing it. The continued availability of these materials to adults for purchase under the ordinance weighs strongly in favor of the ordinance's constitutionality. In upholding the FCC's action to regulate the broadcast of "indecent" material, the Supreme Court observed in Pacifica Foundation that the regulation "does not by any means reduce adults to hearing only what is fit for children. Cf. Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 525. Adults who feel the need may purchase tapes and records or go to theaters and nightclubs to hear these words." 438 U.S. at 750 n. 28, 98 S.Ct. at 3040 n. 28; see also id. at 760, 98 S.Ct. at 3046 (Powell, J., concurring, joined by Blackmun, J.). Similarly, adults under the Minneapolis ordinance continue to have access to the material simply by purchasing it or going to retail establishments that have an adults only policy or segregated sections for those materials that fall within the definition of harmful to minors. For these reasons, we believe that the ordinance "leave[s] open adequate alternative channels of communication," Schad v. Borough of Mount Ephraim, 452 U.S. 61, 76, 101 S.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981), and that it does not unconstitutionally restrict the access of adults to protected material under the First Amendment.[10]
 
 
 25
 Midwest also suggests that the Minneapolis ordinance does not qualify as a time, place, or manner restriction because it is not content-neutral. Although content-based regulation usually is proscribed, some content-based time, place, or manner restrictions have been approved by the Supreme Court. See, e.g., New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); Young v. American Mini Theatres, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Even though the regulation mandated by the Minneapolis ordinance may be a content-based time, place, or manner restriction impinging upon the rights of adults, we nevertheless believe that it is permissible as a reasonable means of attempting to control the merchandising to minors of sexually explicit material obscene as to them.
 
 
 26
 In Young v. American Mini Theatres, the Supreme Court upheld two zoning ordinance amendments that prohibited the location of adult theaters within certain distances of residential areas or certain other kinds of businesses. Justice Stevens, writing for the Court, noted that "there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance...." 427 U.S. at 61, 96 S.Ct. at 2448. A plurality of the Court found that the zoning ordinance was content-based regulation and stated that "what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited, even though the determination of whether a particular film fits that characterization turns on the nature of its content, [and] we conclude that the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures." Id. at 71-72, 96 S.Ct. at 2453 (plurality opinion).
 
 
 27
 Any material covered by the Minneapolis ordinance is likely to be on the "borderline between pornography and artistic expression" since to be subject to the ordinance the material must be obscene at least as to minors. The ordinance here results in a restriction on both the manner in which and the place where particular material may be exhibited. We believe that the City's substantial interest in the well-being of its youth in the instant case supports its classification of the materials at issue, just as Detroit's interest in the quality of its neighborhoods in Young justified that ordinance's zoning restrictions.[11]
 
 
 28
 Similarly, we believe that the Minneapolis ordinance also satisfies the conditions delineated by Justice Powell in his concurrence in Young. In Justice Powell's opinion, the First Amendment "prompts essentially two inquiries: (i) Does the ordinance impose any content limitation on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them?" 427 U.S. at 78. The Minneapolis ordinance imposes no content limitations on the creators of the regulated materials and the materials continue to be available to all adults. The Minneapolis ordinance does have the effect of withholding offensive expression from the young "without restricting the expression at its source," Pacifica Foundation, 438 U.S. at 749, 98 S.Ct. at 3040, and thus is narrowly tailored to achieve its purpose.[12] While the ordinance does restrict to some degree the ability of adults to view these materials prior to purchase, we do not believe these restrictions are "significant" since they relate primarily to the manner of display of the materials and the restrictions do not suppress the materials. Cf. Pacifica Foundation, 438 U.S. at 760, 762, 98 S.Ct. at 3046, 3047 (Powell, J., concurring).
 
 
 29
 That such regulation is allowable in the instant case derives ample support not only from Young, but from other Supreme Court cases as well. For example, the Court observed in New York v. Ferber that it has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." 458 U.S. at 757, 102 S.Ct. at 3354. Additionally, Justice Brennan's dissenting opinion in Slaton implicitly supports the result reached here. In discussing the permissible scope of state regulation of sexually explicit material, Justice Brennan stated:
 
 
 30
 I would hold, therefore, that at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly "obscene" contents. Nothing in this approach precludes those governments from taking action to serve what may be strong and legitimate interests through regulation of the manner of distribution of sexually oriented material.
 
 
 31
 Slaton, 413 U.S. at 113, 93 S.Ct. at 2662 (Brennan, J., dissenting) (emphasis added). We believe it is likely that the Minneapolis ordinance is the type of permissible regulation that Justice Brennan had in mind in Slaton, and in any event we are convinced that it satisfies the requirements for a valid time, place, or manner restriction. Finding a total absence of the "substantial overbreadth" necessary to facially invalidate an ordinance, Ferber, 458 U.S. at 769, 102 S.Ct. at 3361, we affirm the District Court's holding that subsection 6 of the Minneapolis ordinance does not violate the First Amendment.
 
 III.
 
 32
 As its final point, Midwest argues that the District Court erred in severing subsection 7(a) from the remainder of the ordinance after determining that it violated the equal protection clause. Subsection 7(a) exempts schools, religious institutions, and certain other entities and individuals from liability under the ordinance. The District Court found that the motivation behind the exemption was to allow parents to control the manner in which their children are exposed to sexually explicit material. This was to be accomplished by permitting the exempt organizations and individuals to use sexually explicit materials in a non-commercial setting primarily for purposes of sex education. The District Court observed that the ordinance was intended to control the effects of commercialized obscenity on minors and that this purpose would not be defeated by severing the constitutionally unsound provision. 602 F.Supp. at 1375.
 
 
 33
 The District Court relied upon City of Duluth v. Sarette, 283 N.W.2d 533 (Minn.1979), as its authority to sever subsection 7(a) from the balance of the Minneapolis ordinance. 602 F.Supp. at 1375. In Sarette, the Minnesota Supreme Court held that an exemption provision similar to subsection 7(a) was severable from a general obscenity ordinance. The purpose of the exemption there was to allow the exempt organizations to employ the generally proscribed material for "legitimate uses" without potentially becoming subject to criminal penalties. The court in Sarette held that the exemption provision was unnecessary and superfluous given the Miller obscenity standard which already required that the material be without "serious literary, artistic, political, or scientific value" before the material could be regulated. The District Court believed that the analysis used in Sarette was equally applicable to the Minneapolis ordinance. We agree. Since the ordinance is directed at controlling the effects of commercialized obscenity on minors, severance of the exemption provision works no harm to the overall scheme of the ordinance. Only in the event that one of the individuals or organizations listed in the exemption provision attempts to commercially disseminate the proscribed material would the ordinance apply.
 
 
 34
 In holding that the severance of the offending provision of the ordinance is proper, we are not by any stretch of the imagination rewriting the ordinance. The scope of the ordinance and its purpose are clearly stated. The ordinance is aimed at commercial dissemination of material harmful to minors, and we are satisfied that the exemption provision was intended only to clarify that certain non-commercial uses of the material were not proscribed.[13] Since this result is achieved without the exemption provision, severance of that provision was appropriate. This view is in accord with the Supreme Court's instruction in INS v. Chadha, 462 U.S. 919, 934, 103 S.Ct. 2764, 2775, 77 L.Ed.2d 317 (1983), that an unconstitutional provision of an ordinance is "presumed severable if what remains after severance 'is fully operative as a law.' " (citation omitted). Because it is possible to sever the exemption provision without upsetting the legislative scheme, the ordinance remains "fully operative" and we affirm the decision of the District Court in regard to the severance.
 
 IV.
 
 35
 Winston Churchill, speaking before the English House of Commons, once observed that "[t]he United States is a land of free speech. Nowhere is speech freer--not even here where we sedulously cultivate it even in its most repulsive form." See Bartlett's Familiar Quotations 746:6 (15th ed. 1980). Since that statement was made in 1944, the volume and variety of "repulsive" forms of speech available in the United States has increased immeasurably. The ordinance at issue here is intended to limit the exposure of minors to the material in this realm which is thought to be harmful to their development as mature adults. The Minneapolis City Council has acted in response to what it perceives to be a matter of serious concern to the public and a serious threat to the well-being of the City's young. We are not inclined to say that the City's elected representatives are mistaken in their perception of the problem. Even if we were so inclined, it is not the business of the courts to second-guess the wisdom or efficacy of validly enacted legislation. As Justice Black aptly noted in his dissent in Griswold v. Connecticut, 381 U.S. 479, 520-21, 85 S.Ct. 1678, 1701, 14 L.Ed.2d 510 (1965): "[T]here is no provision of the Constitution which either expressly or impliedly vests power in this Court to sit as a supervisory agency over acts of duly constituted legislative bodies and set aside their laws because of the Court's belief that the legislative policies adopted are unreasonable, unwise, arbitrary, capricious or irrational." Since the Minneapolis ordinance places reasonable restrictions upon the display of the material subject to regulation and therefore does not contravene the First Amendment, the judgment of the District Court is affirmed.
 
 
 36
 LAY, Chief Judge, dissenting.
 
 
 37
 I respectfully dissent.
 
 
 38
 If the first amendment means anything, it should be clear that the Minneapolis ordinance is unconstitutional on its face. In dissenting, I am not unmindful of a government's public concern for the well-being of its youth. Before we condone paternalistic censorship by government in a free society, however, this court, as has every other court addressing similar laws, must be certain that such legislation (1) respects the constitutional rights of both adults and minors by not unduly encroaching on the basic freedoms we enjoy through free speech and free press and (2) is reasonably restricted to the evil with which it is said to deal. The Minneapolis ordinance falls far short of compliance with either of these concerns. As the majority's opinion makes abundantly clear, no ordinance or law written in such sweeping terms has, until today, gained constitutional approval.[1] The only two cases upholding laws similarly regulating the display of sexually explicit material to youths are easily distinguished and help point out the constitutional deficiencies of the Minneapolis ordinance.[2]
 
 I.
 
 39
 The Minneapolis ordinance requires booksellers and other institutional sellers who display or sell books or magazines to place an opaque cover on any material bearing a cover that "standing alone" is harmful to minors. In condoning the opaque cover provision, the majority assumes that this provision in no way affects the access of minors to material that is protected as to them. Because the Minneapolis ordinance only requires opaque covers on covers that "standing alone" are obscene as to minors, the majority asserts, it does not affect the first amendment rights of minors. This analysis is not only illogical, but contrary to Supreme Court precedent.
 
 
 40
 The Supreme Court has expressly held that an entire work must be evaluated as a whole in determining whether it is obscene. In declaring facially unconstitutional an ordinance that made it a punishable offense for a drive-in movie theater to exhibit a film containing nudity when the screen is visible from a public street or place, the Supreme Court stated that:
 
 
 41
 Scenes of nudity in a movie, like pictures of nude persons in a book, must be considered as a part of the whole work. See Miller v. California, 413 U.S. 15, 24 [93 S.Ct. 2607, 2614, 37 L.Ed.2d 419] (1973); Kois v. Wisconsin, 408 U.S. 229 [92 S.Ct. 2245, 33 L.Ed.2d 312] (1972). In this respect such nudity is distinguishable from the kind of public nudity traditionally subject to indecent-exposure laws.
 
 
 42
 THE CHIEF JUSTICE'S dissent, in response to this point, states that "[u]nlike persons reading books, passersby cannot consider fragments of drive-in movies as a part of the 'whole work' for the simple reason that they see but do not hear the performance...." At issue here, however, is not the viewing rights of unwilling viewers but rather the rights of those who operate drive-in theaters and the public that attends these establishments. The effect of the Jacksonville ordinance is to increase the cost of showing films that contain nudity. In certain circumstances theaters will avoid showing these movies rather than incur the additional costs. As a result persons who want to see such films at drive-ins will be unable to do so. It is in this regard that a motion picture must be considered as a whole, and not as isolated fragments or scenes of nudity.
 
 
 43
 Erznoznik v. City of Jacksonville, 422 U.S. 205, 211 n. 7, 95 S.Ct. 2268, 2273 n.7, 45 L.Ed.2d 125 (1975) (some citations omitted); see also Kois v. Wisconsin, 408 U.S. 229, 230, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972).[3] Lower federal courts and state courts have also emphasized that the work must be assessed as a whole in determining whether it is obscene, not only in the context of the sale of books and magazines,[4] but also in the context of regulations on the display of books and magazines.[5]
 
 
 44
 The majority argues that Erznoznik and other cases requiring that the work be viewed as a whole involved the suppression of speech rather than the display of speech. The Supreme Court clearly rejected this distinction in stating: "Such a deterrent, although it might not result in total suppression of these movies, is a restraint on free expression." Erznoznik, 422 U.S. at 211-12 n. 8, 955 S.Ct. at 2274 n. 8 (citing Speiser v. Randall, 357 U.S. 513, 518-19, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958)). Similarily, although the Minneapolis ordinance does not ban the sale of material with a cover obscene as to minors, as in Erznoznik, it regulates the manner in which such material may be displayed. It may be, as the majority asserts, that many of the cases striking statutes that do not require consideration of the work as whole involve statutes regulating the distribution rather than the display of books and magazines. The distinction between suppression and regulation of display is without constitutional significance, however, in light of Erznoznik, which in declaring unconstitutional an ordinance regulating the display of movies containing nudity, expressly stated that the entire work must be considered as a whole.
 
 
 45
 In further support of its contention that the opaque cover provision does not run afoul of the "as a whole" requirement, the majority quotes with approval the district court's statement that "to a child who may never acquire and read or view the entire work, the cover of the book or magazine is the work 'as a whole.' " 602 F.Supp. at 1369. I respectfully submit that this is a total non sequitur. If the majority means by this statement that a child is not allowed to purchase a book with an obscene cover, the majority misconstrues the opaque cover requirement. This requirement pertains only to books or magazines that are not as a whole obscene as to minors and which minors may therefore purchase.[6] Thus, the ordinance leads to the absurdity that, although the child is precluded from viewing the cover on display, he or she may peruse and purchase the entire book or magazine.
 
 
 46
 Another possible interpretation of the majority's rationale is that the cover constitutes the whole for any minor who sees the cover but does not read the remainder. As previously indicated, this proposition was expressly rejected by the Supreme Court in Erznoznik v. City of Jacksonville, 422 U.S. at 211 n. 7, 95 S.Ct. at 2273 n. 7.
 
 
 47
 The ordinance does provide "booksellers"[7] with an alternative to the opaque cover provision. If a bookseller physically separates the material so that minors cannot be present or cannot view the material, posts a sign reading "Adults only--you must be 18 to enter," and enforces these restrictions, a bookseller may avoid the opaque cover requirement. This alternative, seemingly approved by the majority, is also a patently unconstitutional infringement on the rights of both minors and adults. To comply with this alternative, a bookseller must place books or magazines that are obscene as to neither adults nor minors, but that have covers deemed obscene as to minors, in "adults only" areas. Such a practice effectively prevents minors from purchasing materials they are constitutionally entitled to purchase. Moreover, because of the stigma attached to "adults only" stores, many adults would forgo exercising their first amendment rights to purchase nonobscene literature if such material were only available in adult bookstores. This "adults only" alternative would likewise impinge on the rights of booksellers. If the bookseller decides to play it safe and establish an "adults only" section, the storeowner would lose the patronage of minors as well as many adults wishing to avoid the stigma attached to "adults only" book stores. If the bookseller chooses instead to sell only nonobscene materials in order to avoid limiting entrance to large numbers of the buying public (all minors and many adults), the bookseller would have to remove from the shelves any book or magazine bearing a cover that might possibly be deemed harmful to minors even though the content of the book or magazine was perfectly proper for all to read. In today's society, this could very easily lead to the suppression of many literary works, including classics and other best sellers. As Justice Frankfurter stated long ago, "Surely this is to burn the house to roast the pig." Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957). It is difficult for me to believe that a free society would sanction such a curtailment of its reading habits.
 
 
 48
 In short, both the opaque cover requirement and its alternative, an adults only section, infringe on the first amendment rights of minors and adults because they regulate the display of material that minors and adults are entitled to purchase. In this sense, the opaque cover provision is even less justifiable than the sealed wrapper requirement because it restricts access to speech that is not obscene as to adults or minors. As the Supreme Court stated in Erznoznik:
 
 
 49
 Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.
 
 
 50
 Erznoznik, 422 U.S. at 213-14, 95 S.Ct. at 2275 (footnote omitted).
 
 II.
 
 51
 Conceding that the sealed wrapper requirement "limits to some extent" the access of adults to material protected as to them, the majority seeks to justify that portion of the ordinance as a valid time, place, or manner restriction. The majority apparently did not consider whether the opaque cover requirement was valid as a time, place, or manner restriction because it evidently concluded that the opaque cover requirement did not implicate the first amendment rights of minors or adults. Because I would conclude that the opaque cover requirement infringes the access of adults and minors to material constitutionally protected as to them, I would also require that the opaque cover requirement be justified as a time, place, or manner restriction before concluding that the Minneapolis ordinance is not unconstitutional on its face. Based on the applicable precedent, I would conclude that neither the sealed wrapper requirement nor the opaque cover requirement is a valid restriction on the time, place, or manner of speech. I would therefore hold that the Minneapolis ordinance is on its face unconstitutionally overbroad.
 
 
 52
 As the majority notes, reasonable time, place, or manner restrictions of speech otherwise protected under the first amendment are permissible to further significant government interests if they are narrowly drawn. Young v. American Mini Theaters, Inc., 427 U.S. 50, 63, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976); Erznoznik, 422 U.S. at 209, 95 S.Ct. at 2272. As the Supreme Court noted in Erznoznik, however,
 
 
 53
 A State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content. But when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power.
 
 
 54
 Erznoznik, 422 U.S. at 209, 95 S.Ct. at 2272 (emphasis added) (citations omitted). The Minneapolis ordinance involved here clearly is not content neutral because its application depends on the message of the material. The majority concedes as much. Nevertheless, the majority argues, the Supreme Court has upheld content-based time, place, or manner restrictions, citing New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); and Young v. American Mini Theaters, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).
 
 
 55
 None of these cases, nor any other Supreme Court decisions, provide support for the ordinance the majority upholds today. In regard to the opaque cover provision of the Minneapolis ordinance, Ferber and Young are clearly distinguishable. In neither of those cases was the "legitimate interest" proferred in support of the legislation an attempt to protect a certain group from the message conveyed by the speech.[8] In Ferber, for example, the legislation was justified as an attempt to protect children from being the subject of pornography, not to protect children from the message of such material. Similarly, the ordinance in Young was a zoning ordinance designed to preserve the integrity of neighborhoods by preventing a concentration of adult movie theaters. In contrast, the opaque cover provision restricts access to materials because of the harmful affects a glimpse of the message of the material may have on minors, even though minors are permitted by law to purchase such material and view the cover after purchase. I would therefore hold that preventing access by juveniles to material that is not obscene as to them is not a compelling government interest and that the opaque cover provision thus is not a valid restriction on the time, place, or manner of speech.
 
 
 56
 I would agree that the City of Minneapolis demonstrates a significant government interest in preventing access by minors to material that, taken as a whole, would be obscene as to them. This of course is the alleged purpose of the sealed wrapper requirement. In promoting the morals of its youths by restricting their access to certain communications, however, the government may not simultaneously create barriers that substantially restrict adult access to material they are constitutionally entitled to obtain. Although the intended effect of the sealed wrapper requirement is to prevent examination and perusal by minors of material obscene as to them, the unavoidable collateral effect of this provision is to severely limit the ability of adults to examine these protected materials. In this respect, the sealed wrapper provision is far more restrictive than necessary to achieve its concededly legitimate purpose.
 
 
 57
 In Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), the Supreme Court struck down a Michigan law making it unlawful for anyone to make available for the general reading public a book found to have a potentially deleterious influence on youth. Id. at 382-83, 77 S.Ct. at 525-26. The Court stated:
 
 
 58
 We have before us legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensble conditions for the maintenance and progress of a free society
 
 
 59
 Id. at 383-84, 77 S.Ct. at 526. The majority distinguishes Butler because the statute involved in that case resulted in the total suppression of material covered by the statute, whereas the Minneapolis ordinance does not totally deny adults access to material that must be displayed and sold in a sealed wrapper. This distinction is superficial on its face because the practical effect of the sealed wrapper provision is identical to that in Butler, namely, to restrict adults to that which is suitable for children.
 
 
 60
 Faced with the restrictions in the Minneapolis ordinance, a book store would be forced to discontinue carrying the restricted materials, ban minors from its store altogether, move a significant portion of its inventory to an "adults only" section, or place the material in sealed wrappers. These alternatives would either preclude adults from browsing through material prior to purchase or would place a heavy burden on store owners to restructure their stores and require adults to go into stigmatized "adults only" areas to examine the materials. The ordinance overlooks the fact that the display of magazines and books plays a vital role in the bookseller's ability to advertise and sell its merchandise. Most books and magazines are purchased only after a potential reader has had an opportunity to peruse the book or magazine's contents. Today, sexually explicit pictures and photographs are common place in many bookstores that deal in nonpornographic literature. This is particularly true in the large volume of sales of paperback books. There should be little question that requiring sealed wrappers on sexually explicit literature would have a tremendous effect on the ability of booksellers to advertize their merchandise. Furthermore, the freedom of adults to scan books and magazines before buying would be severely limited if such works were contained in sealed covers. Surely, many adults who would be required to unseal this literature in public areas in order to peruse the book or magazine would be embarassed to do so. Because the sealed wrapper provision is more restrictive than necessary to protect minors from material that is admittedly unfit for them, I would hold that the Minneapolis ordinance is unconstitutionally overbroad.
 
 III.
 
 61
 Aside from the undeniable overbreadth of the Minneapolis ordinance, one additional factor compels me to conclude that the ordinance is unconstitutional. Originally, the ordinance contained section 7(a), which exempted from criminal prosecution "recognized and established schools, religious institutions, museums, medical clinics and physicians, hospitals, public libraries, governmental agencies or quasi governmental organizations." Minneapolis Ordinance Sec. 385.131(7)(a). After holding that this exemption violates the equal protection clause,[9] the district court determined that the exemption provision was severable from the remainder of the ordinance. 602 F.Supp. at 1375. The district court concluded that the exemption provision was intended to permit exempt organizations to display sexually materials in a noncommercial context, thereby furthering parental control over their children's sex education, and that this purpose would not be defeated by severing the constitutionally unsound exemption. As authority for severing the exemption, the district court relied on City of Duluth v. Sarette, 283 N.W.2d 533 (Minn.1979), in which the Minnesota Supreme Court severed a similarly unconstitutional exemption provision from the City of Duluth obscenity ordinance. The majority has adopted this same rationale on the severability issue. I must once again disagree. Sarette is not only distinguishable, but it serves as direct authority for holding that the entire Minneapolis ordinance under consideration here must be declared unconstitutional.
 
 
 62
 The ordinance involved in Sarette made punishable the sale of material deemed "obscene" as defined by the United States Supreme court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Minnesota Supreme Court determined that because only material lacking "serious literary, artistic, political, or scientific value" was obscene under Miller, the exemption provision was superfluous; it concluded that material sold by these organizations would presumably possess "literary, artistic, political, or scientific value" and would thus not be obscene under Miller. The court expressly noted that by severing the exemption provision from the Duluth ordinance, "we do not alter the intended effect of the ordinance, because protection of legitimate uses of pornographic materials is afforded by the main provisions of the ordinance." Sarette, 283 N.W.2d at 537. The Minneapolis ordinance, however, proscribes a far broader range of conduct than the Duluth ordinance. Severance of the exemption provision here thus has the effect of legislating criminal liability on a class of persons the Minneapolis city council deliberately sought to exempt.
 
 
 63
 The intent of the Minneapolis city council in exempting educational organizations is clearly expressed in a provision of the ordinance that remains a part of the ordinance even after severance of the exemption.[10] Both the district court and the majority assumed that these organizations would remain exempt after severance because the ordinance applies only to the "commercial" sale or display of material. Close examination of the Minneapolis ordinance, however, reveals that this is not the case. If, for example, an educational organization displays sex education material in order to promote the sale of such material, the ordinance would apply to that organization if the material or its cover is deemed "harmful to minors." Because the opaque cover provision allows consideration of the cover "standing alone," the provision does not allow consideration of the contents of the material taken as a whole. It is the contents of the material, however, that would normally be expected to provide the "literary, artistic, political, or scientific value" that the court in Sarette determined would result in exempting these educational organizations even without an express exemption. Thus, unlike Sarette, severance of section 7(a) of the Minneapolis ordinance would clearly alter the intended effect of the ordinance, because the provisions of the ordinance might impose criminal liability on an entity the Minneapolis city council intended to exempt from prosecution. In such situations, courts have not hesitated to declare entire obscenity statutes unconstitutional rather than merely severing constitutionally unsound exemption provisions. See Wheeler v. State, 281 Md. 593, 380 A.2d 1052, 1061 (1977); Tattered Cover, Inc. v. Tooley, 696 P.2d 780, 786 (Colo.1985) (en banc). I would similarly hold that the district court improperly altered the intended effect of the ordinance by severing the exemption provision and that a finding that the exemption is unconstitutional requires that the entire Minneapolis ordinance be declared unconstitutional.
 
 IV.
 
 64
 Writing for this court in 1968, in reversing criminal convictions for mailing and transporting obscene literature, I observed:
 
 
 65
 [W]ithin the juridical balance is the basic concern over governmental interference into free channels of expression. It is far better there be a tight rein on authoritarian suppression, notwithstanding a conflict with some individuals' tastes or customary limits of candor, than that we live in a stifled community of self-censorship where men must feel apprehensive over expression of an unpopular idea or theme. Still within our human possession is the free will to make an independent choice of values and to teach our children to do the same. Paternalistic censorship by government must continue to limit that choice only in the most extreme of circumstances. Thus we view the general reluctance of the law to go further in this area.
 
 
 66
 Luros v. United States, 389 F.2d 200, 206 (8th Cir.1968).
 
 
 67
 I adhere to that statement as being appropriate here.
 
 APPENDIX
 
 68
 Title 15, section 385.131 of the Minneapolis Code of Ordinances provides as follows:
 
 
 69
 Distribution of Materials Harmful to Minors
 
 
 70
 (1) In enacting this section, the city council declares its purposes and intent to be as follows:
 
 
 71
 There exists an urgent need to prevent commercial exposure of minors to sexually provocative written, photographic, printed, sound, or published materials as these are hereafter defined and which are hereby declared to be harmful to minors.
 
 
 72
 (2) It is in the best interest of the health, welfare, and safety of the citizens of this city and state, and especially of minors within the city and state, that commercial dissemination of such sexually provocative written, photographic, printed, sound, or published materials deemed harmful to minors be restricted to persons over the age of 17 years; or if available to minors under the age of 18 years, that the availability of such materials be restricted to sources within established and recognized schools, religious institutions, museums, medical clinics and physicians, hospitals, public libraries, the minor's home, or government sponsored organizations.
 
 
 73
 (3) As used in this section, the terms defined in this subdivision have the meanings given them:
 
 
 74
 (a) "Minor" means any person under the age of 18 years;
 
 
 75
 (b) "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state;
 
 
 76
 (c) "Sexual Conduct" includes any of the following depicted sexual conduct:
 
 
 77
 (i) Any act of sexual intercourse, actual or simulated, including genital-genital, anti-genital, or oral-genital intercourse, whether between human beings or between a human being and an animal.
 
 
 78
 (ii) Sadomasochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a revealing costume or the condition of being fettered, bound, or otherwise physically restricted on the part of one so clothed.
 
 
 79
 (iii) Masturbation or lewd exhibitions of the genitals including any explicit, close-up representation of a human genital organ.
 
 
 80
 (iv) Physical contact or simulated physical contact with the clothed or unclothed pubic areas or buttocks of a human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.
 
 
 81
 (v) An act of sexual assault where physical violence or drugs are employed to overcome the will of or achieve the consent of a person to an act of sexual conduct and the effects or results of the violence or drugs are shown.
 
 
 82
 (d) "Sexual Excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal;
 
 
 83
 (e) "Harmful to Minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, or sexual excitement, when it:
 
 
 84
 (1) predominantly appeals to the prurient, shameful, or morbid interest of minors in sex; and
 
 
 85
 (2) is patently offensive to contemporary standards in the adult community as a whole with respect to what is suitable sexual material for minors; and
 
 
 86
 (3) taken as a whole, lacks serious literary, artistic, political or scientific value.
 
 
 87
 (f) "Knowingly" means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry or both:
 
 
 88
 (1) the character and content of any material which is reasonably susceptible of examination by the defendant; and
 
 
 89
 (2) the age of the minor, provided however that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such minor.
 
 
 90
 (4) It is unlawful for any person knowingly to sell or loan for monetary consideration to a minor:
 
 
 91
 (a) Any picture, photograph, drawing, sculpture, motion picture film, video tape, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct, or sexual excitement and which is harmful to minors.
 
 
 92
 (b) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in clause (a), or which contains explicit and detailed verbal descriptions or narrative accounts of nudity, sexual excitement, or sexual conduct and which taken as a whole is harmful to minors.
 
 
 93
 (5) It is unlawful for any person knowingly to exhibit for a monetary consideration to a minor or knowingly to sell to a minor an admission ticket or pass or knowingly to admit a minor for a monetary consideration to premises whereon there is exhibited, a motion picture show or other presentation which, in whole or in part, depicts nudity, sexual conduct, sexual excitement and which is harmful to minors.
 
 
 94
 (6) It is unlawful for any person commercially and knowingly to exhibit, display, sell, offer to sell, give away, circulate, distribute, or attempt to distribute any material which is harmful to minors in its content in any place where minors are or may be present or allowed to be present and where minors are able to view such material unless each item of such material is at all times kept in a sealed wrapper.
 
 
 95
 (a) It is also unlawful for any person commercially and knowingly to exhibit, display, sell, offer to sell, give away, circulate, distribute, or attempt to distribute any material whose cover, covers, or packaging, standing alone, is harmful to minors, in any place where minors are or may be present or allowed to be present and where minors are able to view such material unless each item of such materials is blocked from view by an opaque cover. The requirement of an opaque cover shall be deemed satisfied concerning such material if those portions of the cover, covers, or packaging containing such material harmful to minors are blocked from view by an opaque cover.
 
 
 96
 (b) The provisions of this subdivision shall not apply to distribution or attempt to distribute the exhibition, display, sale, offer of sale, circulation, giving away of material harmful to minors where such material is sold, exhibited, displayed, offered for sale, given away, circulated, distributed, or attempted to be distributed under circumstances where minors are not present, not allowed to be present, or are not able to view such material or the cover, covers, or packaging of such material. Any business may comply with the requirements of this clause by physically segregating such material in a manner so as to physically prohibit the access to and view of the material by minors, by prominently posting at the entrance(s) to such restricted area, "Adults Only--you must be 18 to enter," and by enforcing said restrictions.
 
 
 97
 (7) The following are exempt from criminal or other action hereunder:
 
 
 98
 (a) Recognized and established schools, religious institutions, museums, medical clinics and physicians, hospitals, public libraries, governmental agencies or quasi governmental sponsored organizations, and persons acting in their capacity as employees or agents of such organization. For the purpose of this section "recognized and established" shall mean an organization or agency having a full time faculty and diversified curriculum in the case of a school; a religious institution affiliated with a national or regional denomination; a licensed physician or psychiatrist or clinic of licensed physicians or psychiatrists; and in all other exempt organizations shall refer only to income tax exempted organizations which are supported in whole or in part by tax funds or which receive at least one third of their support from publicly donated funds.
 
 
 99
 (b) Individuals in a parental relationship with the minor.*
 
 
 
 [1]
 The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota
 
 
 [2]
 The full text of Minneapolis City Ord. Sec. 385.131 is set forth as an Appendix at the conclusion of this opinion
 
 
 [3]
 Subsection 4 of the ordinance prohibits the sale of materials to minors that are obscene as to them. Minneapolis City Ord. Sec. 385.131(4). Midwest has not challenged the constitutional validity of subsection 4 of the ordinance
 
 
 [4]
 In Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Supreme Court approved the concept of "variable obscenity," allowing an adaptation of the prevailing obscenity standard enunciated in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), to assess the obscenity of material relative to minors on the basis of its appeal to them. Since Ginsberg, however, the Court has restructured the obscenity standard for adults in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Subsection 3(e) of the Minneapolis ordinance is substantially the same as the statute in Ginsberg except as altered to reflect the new criteria set forth in Miller. The formulation of the juvenile obscenity standard used in the Minneapolis ordinance is similar to that upheld in M.S. News Co. v. Casado, 721 F.2d 1281 (10th Cir.1983)
 
 
 [5]
 The City challenged the standing of plaintiffs-appellants to seek declaratory and injunctive relief in the proceedings below. The District Court fully addressed this matter and rejected the City's standing arguments. Although the City has not raised the standing issue before this Court, we note our agreement with the District Court's resolution of the issue because of the jurisdictional nature of the standing requirement. We believe that the District Court properly applied the relaxed standing requirements that exist when First Amendment rights and values are potentially at stake. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981); Broadrick v. Oklahoma, 413 U.S. 601, 611-13, 93 S.Ct. 2908, 2915-17, 37 L.Ed.2d 830 (1973); Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972)
 
 
 [6]
 Midwest also asserts that assessing an item's cover "standing alone" is contrary to the Supreme Court's holdings in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), and Splawn v. California, 431 U.S. 595, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977). In both of those cases the Court held that "pandering," the exploitative use of sexuality in advertising, may be used in determining whether the advertised material as a whole is obscene. Again, the context in Ginzburg and Splawn is different from that presented here and we reject the application of those cases in the area of display regulations
 
 
 [7]
 Chief Judge Lay argues in his dissent that a distinction between suppression and regulation of display was rejected by the Supreme Court in Erznoznik. See post at 1401. The sentence following the one cited by the Chief Judge for this proposition, however, notes that the record in that case did not reflect what cost the restraint on expression would have involved. We believe that this latter sentence indicates support for our position that restraints that are minimal and affect only the method of display are permissible
 
 
 [8]
 Midwest cites several cases for the proposition that books and magazines that are "plainly divisible" into separate parts still must be considered as a whole for purposes of determining obscenity. See, e.g., Penthouse International, Ltd. v. McAuliffe, 610 F.2d 1353 (5th Cir.1980); Shealy v. State, 675 S.W.2d 215 (Tex.Crim.App.1984). Midwest concedes, however, that these cases deal with the dissemination of books and magazines rather than with their display. For that reason, we find these cases inapposite as well
 
 
 [9]
 The dissent suggests that we do not address whether the opaque cover requirement is a valid time, place, or manner restriction. See post at 1402. Because we perceive the sealed wrapper requirement as considerably more restrictive and because the opaque cover provision applies only to those materials whose cover is harmful to minors, we believe that the opaque cover provision of the ordinance easily passes muster under the balancing analysis under which the sealed wrapper provision of the ordinance is sustained
 
 
 [10]
 We also reject Midwest's contention that the courts uniformly have condemned display legislation similar to the Minneapolis ordinance. See M.S. News v. Casado, 721 F.2d 1281 (10th Cir.1983); American Booksellers Association v. Rendell, 332 Pa.Super. 537, 481 A.2d 919 (1984). The ordinances involved in the cases cited by Midwest contain absolute prohibitions against display without providing the alternatives contained in the Minneapolis ordinance, see American Booksellers Association v. McAuliffe, 533 F.Supp. 50 (N.D.Ga.1981), or they attempt to regulate material that is not obscene as to minors. See, e.g., Rushia v. Town of Ashburnham, 582 F.Supp. 900 (D.Mass.1983); American Booksellers Association v. Superior Court, 129 Cal.App.3d 197, 181 Cal.Rptr. 33 (1982); Calderon v. City of Buffalo, 61 A.D.2d 323, 402 N.Y.S.2d 685 (1978). To the extent that these or other opinions indicate that the type of display provision at issue here infringes unnecessarily on the protected rights of adults, we respectfully disagree. See McAuliffe, 533 F.Supp. at 56
 
 
 [11]
 Additionally, Midwest challenges the Minneapolis ordinance by asserting that the City Council lacked any empirical data demonstrating that "fleeting glances" of sexually explicit book or magazine covers are harmful to minors. Midwest principally relies on Young and Avalon Cinema Corp. v. Thompson, 667 F.2d 659 (8th Cir.1981), to suggest that an empirical basis is required to enact ordinances containing content-based time, place, or manner restrictions such as the one in the instant case. We reject the application of that requirement here
 It is true that demonstrated findings that the presence of adult theaters caused neighborhood deterioration were a factor in upholding the ordinance in Young. That case and the other cases cited by Midwest, including Avalon, however, all involve zoning regulations restricting business locations notwithstanding any obscenity challenge to films exhibited at those businesses. Legislatures need not evince evidence that is "scientifically certain" to support an enactment that regulates material that is obscene as to minors; instead, "[t]o sustain state power ... requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors." Ginsberg, 390 U.S. at 641, 88 S.Ct. at 1281. The City Council here relied on the findings and recommendations of the City Task Force on Pornography which had conducted hearings and reviewed literature on the subject. The Court in Ginsberg approved a statute regulating the same material as does the Minneapolis ordinance. We see no distinction between finding that exposure by virtue of the display of proscribed materials is harmful to minors and finding that the sale of proscribed material is harmful. We cannot say that the legislature's conclusion here is not rational.
 
 
 [12]
 In M.S. News Co. v. Casado, 721 F.2d 1281 (10th Cir.1983), the Tenth Circuit upheld a Wichita ordinance similar to the Minneapolis ordinance against a challenge to its facial validity. The Wichita ordinance prohibited the display of materials harmful to minors when minors could be present and the material would be exposed to their view. The materials were not displayed for purposes of the ordinance if they were concealed behind "blinder racks" covering the lower two-thirds of the covers of the material. The court held that the regulation, although based on content, was a reasonable time, place, or manner regulation and that it did not unreasonably restrict adults' access to material obscene as to minors but not obscene as to adults. While the restrictions here are somewhat broader than those in M.S. News, we do not view these restrictions as circumscribing the access of adults to protected material in any significant manner
 
 
 [13]
 For this reason we disagree with Midwest's assertion that severing subsection 7(a) expands the class of persons subject to criminal liability. We read the ordinance to state that any person, including those enumerated in the exemption provision, who commercially disseminates the proscribed material is subject to criminal liability. Deleting subsection 7(a), therefore, does not expand the class of persons potentially liable under the ordinance
 
 
 [1]
 For cases in which courts have declared unconstitutional similarly broad statutes regulating the display of sexually explicit material, see, e.g., American Booksellers Association v. Strobel, 617 F.Supp. 699 (E.D.Va.1985); Rushia v. Town of Ashburnham, 582 F.Supp. 900 (D.Mass.1983); American Booksellers Association, Inc. v. McAuliffe, 533 F.Supp. 50 (N.D.Ga.1981); American Booksellers Association v. Superior Court, 129 Cal.App.3d 197, 181 Cal.Rptr. 33 (1982); Tattered Cover, Inc. v. Tooley, 696 P.2d 780 (Colo.1985); Dover News, Inc. v. City of Dover, 117 N.H. 1066, 381 A.2d 752 (1977); Calderon v. City of Buffalo, 61 A.D.2d 323, 402 N.Y.S.2d 685 (1978)
 
 
 [2]
 The majority cites M.S. News Co. v. Casado, 721 F.2d 1281 (10th Cir.1983), and American Booksellers Association v. Rendell, 332 Pa.Super. 537, 481 A.2d 919 (1984), as examples of legislation similar to the Minneapolis ordinance that have been held constitutional. These ordinances, however, are far less intrusive on the rights of adults and minors than the Minneapolis ordinance. Unlike the opaque cover provision of the Minneapolis ordinance, the ordinances involved in Casado and Rendell only regulate the display of material that, when taken as a whole, is obscene as to minors. The Casado ordinance requires that the bottom two-thirds of material deemed harmful to minors be covered by blinder racks; the Rendell ordinance prohibits the "display" of material deemed harmful to minors, which the court noted would not include the mere shelving or stocking of such material, but only the ostentatious showing or presentation of such material in a manner that would direct attention to it. Neither case provides authority for the sweeping ordinance the majority upholds today
 
 
 [3]
 The majority argues that Erznoznik is distinguishable because the Minneapolis ordinance is limited only to those materials that are obscene as to minors. I cannot agree. As with the ordinance in Erznoznik, the opaque cover portion of the Minneapolis ordinance regulates material that is entitled to first amendment protection even as to minors if a portion of that material standing alone, e.g., the cover, is obscene as to minors. In concluding that the work need not be considered as a whole because the material is obscene as to minors, the majority presumes the truth of the very proposition it is attempting to prove. In other words, in concluding that the cover may be deemed "the whole work" and thus, viewed in isolation, the majority assumes that the cover may be viewed in isolation and that the cover is therefore obscene and not protected as to minors. Clearly, there would have been no need for the Erznoznik court to have discussed the "as a whole" requirement had the Court not contemplated a situation in which at least one scene in the movie was "obscene" as to minors but the movie as a whole was not
 
 
 [4]
 See, e.g., Playboy Publications, Inc. v. McAuliffe, 610 F.2d 1353, 1354, 1369 (5th Cir.1980); State v. Walden Book Co., 386 So.2d 342, 344-45 (La.1980); Leech v. American Booksellers Association, Inc., 582 S.W.2d 738, 749 (Tenn.1979); Shealy v. State, 675 S.W.2d 215, 216 (Tex.Crim.App.1984) (en banc); cf. United States v. Miscellaneous Pornographic Magazines, 526 F.Supp. 460, 466 (N.D.Ill.1981)
 
 
 [5]
 See, e.g., Rushia v. Town of Ashburnham, 582 F.Supp. 900, 903 (D.Mass.1983); American Booksellers Association, Inc. v. McAuliffe, 533 F.Supp. 50, 57 n. 10 (N.D.Ga.1981); Dover News, Inc. v. City of Dover, 117 N.H. 1066, 1069, 381 A.2d 752, 755 (1977); see also American Booksellers Association, Inc. v. Superior Court, 129 Cal.App.3d 197, 205, 181 Cal.Rptr. 33, 38 (1982) (statute invalidated because, among other things, it restricted the display of material the contents or cover of which was sexually explicit); Calderon v. City of Buffalo, 61 A.D.2d 323, 330, 402 N.Y.S.2d 685, 689 (1978) (same)
 
 
 [6]
 If the book or magazine "taken as whole" is in itself obscene as to minors then the ordinance requires that the material be displayed and sold in a sealed wrapper. I discuss this requirement in Part II, infra
 
 
 [7]
 It should be clear that in modern merchandizing of paperback books, which include classics as well as books of modern romance, grocery stores, department stores, drug stores, and many other commercial establishments must also be considered "booksellers"
 
 
 [8]
 Pacifica can be distinguished from both the opaque cover provision and the sealed wrapper requirement because of the privacy interest implicated when a message is thrust upon unwilling listeners in the privacy of their homes. See Erznoznik, 422 U.S. at 209, 95 S.Ct. at 2272
 
 
 [9]
 The City has not appealed this ruling of the district court
 
 
 [10]
 That provision provides:
 (2) It is in the best interest of the health, welfare, and safety of the citizens of this city and state, and especially of minors within the city and state, that commercial dissemination of such sexually provocative written, photographic, printed, sound, or published materials deemed harmful to minors be restricted to persons over the age of 17 years; or if available to minors under the age of 18 years, that the availability of such materials be restricted to sources within established and recognized schools, religious institutions, museums, medical clinics and physicians, hospitals, public libraries, the minor's home, or government sponsored organizations.
 Minneapolis Ordinance Sec. 385.131(2).
 
 
 *
 In June 1985, the Minneapolis City Council repealed subdivision seven (7) of the ordinance